Mr. Rosenbluth, my name is Martin Rosenbluth, and I am appearing today on behalf of Mr. Rafael Tiscareno, who is with us today in the courtroom, and I would like to reserve five minutes for rebuttal, which will be given by my co-counsel, Mr. Derek Hensley, and thank you for allowing oral arguments in this case. I hope it's helpful to the process. This is an immigration case. It's focused on cancellation of removal, and it's also a case of first impression, as agreed to by all parties. Our client was precluded from 81 days, which made him ineligible to establish good moral character, which is one of the provisions of cancellation of removal. Now, cancellation of removal is a statute which provides relief from removal, largely for the benefit of the respondent's U.S. citizen relatives, in this case, Mr. Tiscareno's autistic son. Now, what sets this case apart from other cancellation or removal cases is that he's being barred from relief from removal because of his sentence for unlawful entry. So, in other words, he's being barred from relief from unlawful entry because he served the sentence for unlawful entry. Now, this case arises from the tension between three different statutes. One is a criminal statute, 1325A, which is the criminal statute for unlawful entry. The second is the cancellation of removal statute itself. And the third is 101F7, which is the part of the statute that says if you serve 180 days in jail, then you're barred from establishing good moral character. Now, definitional statutes are there to facilitate the implementation of the operational statute. And they're not there to negate the purpose of the statute itself. So, therefore, 101F7 needs to be looked at in the context of cancellation of removal and the rest, in fact, of the INA. Now, the Supreme Court looked at this concept in Lawson v. Sewanee-Fruit and to paraphrase that decision, that statutory definitions control the meaning of statutory words in the usual case. But that case was an unusual case. So, the court said that if we read the definition in a mechanical fashion, we create obvious incongruities in the language and we destroy one of the major purposes of the provision, which in that case was the prevention of employer discrimination against handicapped employees. But the court decided that a mechanical reading would defy congressional intent. It's very similar to the fact pattern here, where Mr. Tisgrainu is being barred for cancellation of removal solely because of the mechanical reading of 101F7. And this court, in fact, echoed that same statutory analysis in Piedmont Environmental Council. And there, this court said, in determining plainness or ambiguity of statutory language, the court refers to the language itself, the specific context in which that language is used and the broader context of the statute as a whole. So, in this case, that statute would be the INA. So, when the BIA ruled that Mr. Tisgrainu is barred from relief under the plain language of the statute, that was only because they read it in isolation from all the other immigration statutes. And that is where the BIA, that is where the BIA erred. Now, their mechanical reading of 101F7 only makes sense because they put it, kind of put it in the glass jar on the shelf and they isolated it from the rest of the INA. So, that's why in our opinion, the BIA's reading is not correct because they failed to understand that 101F7 is in direct tension with another statute, in this case, cancellation of removal statute, which led to a decision that defies congressional intent in cancellation of removal. We also disagree with the government that we failed to exhaust the issue of the... So, is there anything we can look to that would indicate to us that Congress clearly did not intend for 1101F7 to apply to improper re-entry cases? Well, it's not a proper re-entry, Your Honor. It's to the sentence, this sentence here. So, if there's a number of within 101F, which talk about all these different specific crimes that would preclude someone for applying, for establishing good moral character. And the fact that they didn't mention unlawful entry at all, and the fact that the BIA has consistently said in decision after decision, going back to the matter of teeth, that even numerous unlawful entries, even if you've been convicted of unlawful re-entry, that that does not preclude good moral character. So, it's illogical to assume that if Congress had wanted to bar someone from applying for relief from entry for an offense of unlawful entry, they would have said so specifically. Well, does everybody who is convicted, found guilty, or pleads guilty to unlawful re-entry get 181 days sentence? Do they all get sent to prison? No, they don't. But in fact, if you look at the statistics which we provided in our reply brief, the percentage of people who are being prosecuted under 1325A has been increasing over the years. In fact, last year, unlawful entry was the number one offense, the number one offense that was all other offenses, drug offenses, etc. What does that show? Well, I think that ICE can probably answer that question. Department of Homeland Security can probably answer that question better than I do. I don't have access to what their motives are there. But, I mean, the fact that... Well, they don't make prosecution decisions, do they? Or in general, do they? They do, but they're the ones who, first of all, are the investigator of the case. They're the ones who have to swear out the arrest warrant. The ICE agent who was covering Mr. Tiscareno's case was in the federal courtroom from day one and was a very key part of it. The Attorney General makes the prosecutions. That's true, but it can't happen without DHS. DHS is the key component there. So, and the length of the sentences has also been steadily increasing. If you look at the statistics we provided, the sentences... 12.8% receive sentences greater than or equal to 180 days. And this past year, I believe the partial statistics we got from Lester, I believe, is 12.9. So, it's still a very small percentage. I mean, the point is, just because you're convicted of unlawful reentry doesn't mean you're automatically not able to establish... That's true, but if you look at the number of people, if you take those statistics, and again, I apologize, I'm not a math whiz, but if you take those statistics and you compare them to the total number of prosecutions, it's greater than the number, the total number of cancellation of removal visas, which are given every year. So, only 4,000 people per year are entitled to or granted cancellation of removal. The number of people who are precluded is greater than that number. So, it may not sound like a whole lot, you know, 12.9%, but in terms of if DHS is able to preclude that number of people from applying for cancellation of removal, in our opinion, that number is actually very high. They can't preclude them unless another judge has independently determined that the sentence should be over 180 days. And we don't dispute that, but DHS is an essential part of the process. Without DHS swearing out that arrest warrant, without DHS pushing for that prosecution, that prosecution cannot happen. And in this case, I mean, the ICE agents involved in the case, along with... But the judges oppose the sentence. Attorney General makes the prosecution decision, the judge opposes the sentence, and the statute talks about the period of confinement. That's correct. And again, we're not questioning that at all, Your Honor. What we're questioning is because of the fact that it basically gives a federal district judge total power over a decision, which is inherently part of the powers that Congress granted to an immigration judge, that in this context, it doesn't make any sense. That's why we were saying that we're asking for a very narrow ruling here that 101F7 should not apply to 1325A. We're not saying that it shouldn't apply to all immigration offenses, as the government alleges in their brief. We're just saying a very narrow interpretation, again, because if you look at the fact that the only offense that Mr. Tiscarreno was convicted of was entry, and cancellation of removal is supposed to provide relief for people who entered the United States illegal, in our opinion, that's fundamentally illogical. So to get back to the argument I was making a moment ago, that one of the things that the government says in their brief is that we didn't have administrative exhaustion. We didn't reach our burden for administrative exhaustion on the issue of when the 10-year period should start. And the reason for that was that we were unaware that that was even an issue, despite the fact that in the immigration court, I asked for the notice to appear a number of times. I sent numerous emails to ICE asking for the notice to appear, and they never provided. The immigration judge assumed that he had dealt with that issue when he read the charges from the notice to appear. But the question that the judge asks in the court is not, did you see the time stamp notice to appear as it was served on the court? All the judge asks is, do you conceive proper service of the notice to appear? So even if we had gone to the extreme step of actually filing a legal FOIA, the notice to appear that we would have received would not have resolved this issue. And we, in fact, believe that the emails that we sent, you know, meet the minimum criteria for what a FOIA request would be. And the notice to appear that Petitioner received was on November 15, 2010? That's correct. And we didn't know until we got the administrative record from the court, and it's the very last page of the administrative record, that the notice to appear was not served on the immigration court until he had been convicted in the criminal court, he had served his entire sentence, he was released on an immigration bond from the immigration custody. But at the record, at AR-17, the petitioner adopted the findings of fact of the immigration judge, one such finding was that the government served the petitioner on November 15, 2010. That's correct. But the problem here was, it wasn't the copy that was served on the petitioner. The problem is, when was it served on the immigration court itself? Because that affected, excuse me, Your Honor, that affected the whole time frame. So Mr. Chiscarreño could not have applied for any relief at all from the immigration court until that notice to appear was served on the court itself. So that affects the whole time frame for the purposes of Ortega Cabrera. So Mr. Chiscarreño's case is totally outside of the facts of Ortega Cabrera. Those facts were never dealt with in Ortega Cabrera. So one of the things that we're asking for is that either this court, which has the authority to rule that within the Ortega Cabrera framework of the three options of when that 10-year period should start, that the appropriate time frame in that case would be when the NTA was served on him. But we never had the opportunity to raise that question because of the fact that we didn't have access to the notice to appear in that way. And the other option would be for this court to remand the case back to the BIA so we could get a ruling on that aspect of the case when the 10-year time frame would be appropriate to serve in his situation. And I see that my time is 14 seconds, and I wanted to reserve five minutes for rebuttal. Okay, that's fine. I think we understand your position, Mr. Rosenbluth. Thank you very much. We'll hear from Mr. Blakely. Good morning, Your Honors. May it please the Court, John Blakely on behalf of the Respondent Attorney General of the United States. Your Honors, the plain language of the statute governs this case. I agree with counsel that it's appropriate to look to the context. And if this Court would like, I'd gladly go into the context of cancellation removal. I think it's appropriate to look at the larger context here. And the premise of counsel's argument in this case is that cancellation removal is this benefit that's been extended to vast numbers of individuals who are entering this country. And he's accurate in saying that it's not just for those who've entered illegally, but it's also available for those who've entered legally and then gone into an illegal status, who violated their status. It's also available for those who entered legally, remained legally, and for some reason were put in removal proceedings, and maybe perhaps because they committed a crime are then found removable. It's available to all those people. But Congress set very high standards for who is eligible for cancellation of removal. There's nothing that illustrates that better than the hardship standard. The old version of cancellation removal is suspension of deportation. And under that version, the hardship standard was extreme hardship. And in 1996, Congress looked at that standard and said, too many people are qualifying under that standard. And they raised it to exceptional and extremely unusual hardship. Which is a far higher standard than extreme hardship. It was for one reason and one reason only to make it more difficult. In addition, there's a 10-year continuous fiscal presence requirement. And Congress enacted a stop time rule because they no longer wanted individuals to be able to establish that 10 years through the delay in proceedings. And I think it's appropriate to look at the good moral character determination in that context. That it's not just everyone who is eligible for cancellation of removal. Not everybody should be able to apply. Not everybody should qualify once they have applied. And so the plain language of the statute here doesn't preclude somebody who has an illegal entry. It only precludes a very small proportion of those who have entered illegally. Not only is it those who've been prosecuted, which is only about 50,000 a year of the more than 11 million who would potentially, could potentially be put in proceedings and qualify for cancellation removal. So we've only got 50,000 a year of being prosecuted. Roughly 10% of those are given sentences of 180 days or more. And then some percentage of that actually end up being confined for 180 days or more. I don't have those statistics. But in any event, it's a very small proportion. And Congress has spoken here very clearly that if for any reason you've been confined for more than 180 days, we're going to say that you haven't met good moral character. And the reason they defined it that way in this case was very simple. It was trying to simplify what happens in immigration court. There are some people for whom the good moral character determination is very simple. Those are the ones who have no criminal record. They have no adverse factors of any kind. It's very easy for an immigration judge to look at those cases and say, you meet the good moral character determination. In fact, I think of the cancellation removal cases I've seen, the vast majority, that's a gimme for the applicant is meeting good moral character. There are then those who've been convicted of aggravated felonies where they've been given 10 years. And it's very easy to look at those and see that they don't qualify. There are then the harder cases where just the crime itself, the conviction itself, doesn't necessarily establish it. Well, the Congress wanted to simplify that for the immigration judge. They wanted to say, well, we can make this very clear. If they were confined for more than 180 days, you don't even need to have to ask. You don't have to figure out whether that crime is something that necessarily says they get questionable character. If it's greater than 180 days, it is. So I'd ask this court simply to accept the board's plain language interpretation. And if there are no more questions, ask you to deny the position. I do have a question. Can you address his argument that he couldn't exhaust his remedies on this issue before the CIA because they had not received the notice to appear in a timely manner from the government? Well, first, on page 151 of the record, you'll find the actual copy of the notice to appear. And you'll see on there a signature from the petitioner that acknowledges that he has received the notice to appear. In addition to that, on page 68 of the record, you'll notice that there's a concession from counsel that he has received the notice to appear. And I understand his statements that he had sent emails asking for an additional copy of the notice to appear later. And I don't have anything to tell me how many times or how exactly he did that and whether, in fact, the counsel for the government responded to that. I don't have that information. But I do know that he did receive it. And I also know that once he received the administrative record, if he felt at that point that there was an issue, that this notice to appear with a date stamp was new evidence, then that would have been caused to raise that issue with the board, a motion to remand to the board that says new evidence is available that indicates that something needs to be addressed by the board here. And to that extent, he's raising a question about a matter of Ortega Cabrera and whether its interpretation should have changed because of the difference here. And there's no reason to suggest that whether it was date stamped in November or in March or at any other time, it would have any effect at all on the board's interpretation of the statute. And he argues in his reply brief that there should be a different interpretation of the statute based on what crime was committed and based on different equities. There's nothing to suggest that the statute should be interpreted differently on that basis. The board, in the matter of Ortega Cabrera, looked at the statute and decided that the statute should be interpreted differently on the basis of what crime was committed. And they decided that it was clear from the way that Congress had looked at the different factors that would automatically preclude good moral character. And in particular, they talked about the fraud in the application for immigration benefits. That's what a matter Cabrera was focused on. And they said if Congress certainly could not have concluded that an alien could file an application for cancellation or removal and lie in that application but not be found by that adjudicator to not have good moral character, that didn't make sense. So they felt that it was appropriate to expand the period, well, expand to shift the period of good moral character for 10 years from the point of the final adjudication. And there's nothing in the reasoning of Cabrera that would suggest that the underlying crime would make any difference for this. So was this exhausted? No, it was not exhausted. There were alternative venue or alternative options for counsel to have sought here to get the issue in front of the board. And he's not exhausted it. And then this court has no reason to reach that issue. If you do reach the issue, there's no reason to overturn the board's reasonable interpretation of the statute and to change the period over which the board examines good moral character. So if there are no other questions, I'll ask the court to deny the petition for review. Okay. Thank you, Mr. Blakely. Thank you. Good morning, Your Honors. If I may, I believe that matter of Ortega-Cabrera was actually a matter of evaluation of a stale crime of alien smuggling that had occurred more than a decade prior to the final administrative decision and had, just as a reference, other cases that had also dealt with immigration fraud. And my understanding of the rationale of Ortega-Cabrera is that actions that occur closer to the time of the final administrative decision need to be included. And what Ortega-Cabrera actually did is it moved that moving tenure window up to the Because Mr. Ortega-Cabrera smuggled his family into the country more than 10 years before the final decision was made, that window of good moral character doesn't include that crime anymore. And so Ortega-Cabrera is actually very helpful to us because it articulates the idea that the good moral character bars we're talking about are actually designed to capture good moral character and as close as possible to the final administrative decision. What's special about our case is that there is a 10-year window of good moral character preceding the issuance and service of the NTA on our client and he was not able to bring a claim in immigration court to have that speedily adjudicated until that was actually served on the immigration court. There's a section of the CFR that says until ICE or DHS in its own discretion decides to place that NTA on file with the immigration court that there is no jurisdiction to take any action. And so we are distinguishable but we fit within the spirit of Ortega-Cabrera that this crime of illegal entry which happened more than a decade prior to the issuance of the NTA is not really relevant and the board would be in a good position to craft new precedent that addresses our unique set of circumstances or at the very least accept its own option number one out of the three options Ortega-Cabrera discusses which is the 10-year window prior to the NTA because this is an extremely stale act that was prosecuted in the sole discretion of DHS to put those criminal charges in action after they issued the NTA even though they knew that this was stale, very, very stale. And Mr. Rafael Disparanio-Garcia had spent 10 years in the United States, raised three cases, and is still a candidate for cancellation of removal relief, Your Honor. We also wanted to actually go along with the government's position that cancellation of removal relief is a continuation of the suspension of deportation remedy that had been available since the 1950s up to the mid-1990s during which the case law we cite, matter of tea, matter of carbohol, discussed good moral character and the fact that neither the agency nor Congress had ever intended for mere unlawful entries let alone repeat entries or even convictions for multiple reentries, all of which are different under the statutes and are penalized in different ways now, all of that was specifically excluded from a consideration of good moral character and the government actually wants you in this case to support the BIA's decision in our case which would undermine the prior agency decisions by finding that a conviction for immigration judges ability to reach a determination of good moral character by applying this bar, by looking at the bar in a vacuum and looking at it outside of the scope of what it was for, it's a catch-all for state law crimes or for other federal crimes that the INA doesn't contemplate whereas the INA clearly expresses those crimes within the INA that should be penalized or should not and the agency's prior interpretations of what should or should not qualify or disqualify a person from good moral character when looking just within the confines of the Immigration and Nationality Act and Government Council also said that as many as 11 million people are here illegally now, I would say that that means that in the context of cancellation they would have up to potentially millions of potential new criminal actions that they could bring in order to sway which aliens do or do not qualify for cancellation relief if we take it as granted that some judges will be inclined to sentence closer to six months and some will not and I think our statistics and our reply brief indicate that all of the co-defendants of our client when they were sentenced in the district court regardless of how many prior entries they had or other ties to the United States all got 180 days and were disqualified from relief or honors. What does that show? And that just shows that it is arbitrary and we haven't had a lot of time to discuss our constitutional arguments and I see that I'm out of time but it does show that there is an unfortunate interplay between DHS's ability to prosecute certain individuals and its role in the immigration courts that we think is not what Congress intended and would be a violation of procedural due process and for that reason we would ask that the court either craft its own solution or remand for the Ortega Cabrera decision which is the first issue in our brief that the court either craft a new minor read 101 f7 to not include 1325a convictions and sentences as relevant to good moral character or else remand to the BIA to say that you did not look at this in the way an agency is supposed to and weigh all the facts under the statutes you're supposed to administer. This isn't even a Chevron question at this point because the agency didn't do its job and analyze 101 f7 in the context of the INA. It was a very short opinion saying we're bound by the plain language of the statute and it's not. It regularly finds ambiguity and it failed to do so here. If you find that the statute is ambiguous you can and the BIA to actually interpret it in a meaningful way and this court is the only court that can rule on our third argument which is the constitutional claim of a failure of procedural due process. Thank you so much for oral arguments today your honors if there are no further questions. All right we'll come down and greet counsel and then go into the last case.
judges: William B. Traxler, Jr., Robert B. King, Stephanie D. Thacker